IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JONES PLANTING CO. III, individually and on behalf of all others similarly situated, | Case No. 1:23-cv-147 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC., | |
| Defendants. | |

Plaintiff Jones Planting Co. III, individually and on behalf of all others similarly situated (the "Class", as defined below), upon personal knowledge as to the facts pertaining to itself and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action complaint to recover injunctive relief, treble damages, and other relief as appropriate, based on violations of federal antitrust law committed by Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (collectively, "Syngenta") and Corteva, Inc. ("Corteva").

## I.    NATURE OF THE ACTION

1.      This action is based on Defendants' anticompetitive scheme to impede competitors and artificially inflate the prices that U.S. farmers pay for pesticides (also known as "crop protection products"). Defendants do this by deploying a set of so-called

"loyalty programs," which are designed to severely limit the availability of lower-priced generic products. Through this scheme, Defendants have suppressed generic competition and maintained monopolies long after their lawful exclusive rights to market particular chemicals have expired. These unlawful business practices cost farmers many millions of dollars a year.

2.      Every year, U.S. farmers purchase over ten billion dollars of crop protection products ("CPPs"), which include herbicides for destroying weeds and other unwanted vegetation, insecticides for controlling a wide variety of insects, and fungicides used to prevent the growth of molds and mildew. CPPs are crucial farm inputs that improve crop yields and food security for everyone in the United States. And every year, U.S. farmers collectively pay many millions of dollars more than they should for these products because of Defendants' so-called "loyalty programs," which function as unlawful exclusionary schemes. Defendants design those programs to exclude and marginalize competitive generic products even after relevant patent and regulatory exclusivity periods expire and to maintain inflated, supracompetitive prices. This action seeks to end those "loyalty programs," restore competition in this vital sector of the economy, and recover damages for the victims of Defendants' scheme: American farmers.

3.      Congress has enacted a comprehensive regulatory regime for the crop-protection industry that promotes the twin goals of product innovation and price competition. "Basic" manufacturers like Defendants Syngenta and Corteva initially

develop, patent, and register the active ingredients within CPPs. They may then exploit the commercial potential of their innovations through lawfully obtained exclusive rights for a period of years. After patent and regulatory exclusivity periods expire, generic manufacturers may enter the market with equivalent products containing the same active ingredients and relying upon the same toxicology and environmental impact data. Unimpeded competition from generic products predictably leads to dramatic price reductions. This regulatory structure thus incentivizes innovation while encouraging price and other competition—all of which benefits U.S. farmers and consumers.

4.      Defendants systematically undermine and frustrate the goals of this system. When exclusivity periods for CPPs expire and generic manufacturers threaten to launch lower-priced competing products, Defendants use their loyalty programs to exclude generic manufacturers from the traditional distribution channel, which is a critical link between manufacturers and farmers.

5.      Under their respective programs, Defendants offer each participating distributor substantial payments to exclude or minimize generic manufacturers. Defendants promise the distributors a complex set of incentive payments based on its purchases of branded CPPs on the condition that the distributor limit its purchases of comparable generic products to a set percentage share. Defendants term this a "rebate" for "loyalty." In substance, however, these are exclusion payments to distributors. Defendants pay a portion of their elevated profits to distributors in exchange for the

3

distributors excluding Defendants' generic competitors, resulting in near exclusivity for Defendants.

6.      Defendants' loyalty programs are designed to hinder the entry and expansion of generic manufacturers, resulting in, among other things, higher prices than would have otherwise prevailed and costing farmers many millions of dollars in overcharges. Distributors participate in and comply with Defendants' loyalty programs because Defendants reward those who participate and penalize those who do not. Distributors profit more from accepting Defendants' exclusion payments than they would from distributing lower-priced generic products in substantial volumes. Distributors come to depend on these payments and losing them would often have severe financial consequences.

7.      Because a small number of large distributors dominate the sale of CPPs in the United States, each Defendants' scheme almost entirely forecloses generic competitors from efficient distribution of their products, preventing generic competitors from making significant sales to national distributors.

8.      Each Defendant expressly designs its program to maintain its ability to price its products above competitive levels while still retaining large market shares. Defendants thus enjoy outsized profits during the "post-patent" period—when prices would otherwise fall substantially.

9.      Defendants' loyalty programs enable Defendants to maintain high prices and dominant market positions years after exclusivity for an active ingredient has

4

expired. Defendants' schemes have forced generic manufacturers to exit markets encumbered by loyalty programs or to decide not to enter due to those programs. Even when they offer competitive products, generic manufacturers are relegated to selling limited volumes, often through undesirable, less efficient channels of distribution.

10. Absent their unlawful conduct, Defendants would face increased generic competition, which would lead to increased choice and lower prices for American farmers. Farmers would save many millions of dollars each year when paying for essential CPPs.

11. After an investigation of the conduct described herein, the United States Federal Trade Commission ("FTC"), joined by the States of California, Colorado, Illinois, Indiana, Iowa, Minnesota, Nebraska, Oregon, Texas, and Wisconsin, filed a complaint in the Middle District of North Carolina seeking permanent injunctions to end Defendants' anticompetitive "loyalty programs." That case is ongoing.

12. As a direct and proximate result of Defendants' anticompetitive conduct, Defendants have maintained supracompetitive prices for CPPs by denying farmers access to less expensive generic products and shielding their own products from price competition. Plaintiff and the Class (defined below) have been injured by Defendants' anticompetitive conduct in the form of overcharges they paid for crop protection products.

5

## II. JURISDICTION, VENUE, AND TRADE AND COMMERCE AFFECTED

13.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(d) and 1367 because this is a class action in which the amount in controversy exceeds $5,000,000 and in which some members of the proposed Class are citizens of a state different from some Defendants, and because Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.  The Court has further jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  Plaintiffs seek actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct. Plaintiffs also seek injunctive relief against Defendants for violating Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1-2).

14.     Venue is appropriate in this district because Defendants reside or transact business within this district, and they transact their affairs and carry out interstate trade and commerce, in substantial part, in this district and/or have an agent and/or can be found in this district. Venue is also appropriate within this district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. § 1391(b), (c) and (d).

15.     This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, shipped, sold, and/or delivered substantial quantities of CPPs throughout the United States, including this District; (c) had substantial contacts with the

6

United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

16.     Defendants' and their co-conspirators' conduct, as described herein, was within the flow of, was intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

### III.   THE PARTIES

17.     Plaintiff Jones Planting Co. III is a Mississippi company headquartered in Yazoo City, Mississippi. During the Class Period, Plaintiff purchased CPPs manufactured by Defendants, including those containing the chemical Azoxystrobin, at prices that were artificially inflated as a result of Defendants' anticompetitive scheme, and thereby suffered antitrust injury.

18.     Defendant Syngenta Crop Protection AG is a for-profit company headquartered in Basel, Switzerland and is organized and existing under the laws of Switzerland. Since in or about May 2021, Syngenta Crop Protection AG has been an indirect subsidiary of Sinochem Holdings Corporation Ltd., a global chemical company based in Beijing, China. Syngenta Crop Protection AG's North American headquarters is located in Greensboro, North Carolina.

7

19.     Defendant Syngenta Corporation is a corporate affiliate of Syngenta Crop Protection AG and is headquartered in Wilmington, Delaware. Syngenta Corporation is a corporation organized and existing under the laws of the State of Delaware.

20.     Defendant Syngenta Crop Protection, LLC is a corporate affiliate of Syngenta Crop Protection AG and is headquartered in Greensboro, North Carolina. Syngenta Crop Protection, LLC is a limited liability company organized and existing under the laws of the State of Delaware.

21.     Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC each transacts or has transacted business in this District, and each is engaged in the development, manufacture, and sale of CPPs.

22.     Corteva, Inc. is a publicly held, for-profit corporation headquartered in Indianapolis, Indiana. Corteva is the successor company to the agriscience businesses of E.I. du Pont de Nemours ("DuPont") and Dow Chemical Company ("Dow"). Corteva is a corporation organized and existing under the laws of the State of Delaware.

23.     Corteva transacts or has transacted business in this District and is engaged in the development, manufacture, and sale of CPPs.

## IV.  FACTUAL ALLEGATIONS

### A.     Crop Protection Products: Industry Background

24.     Pesticides are chemicals used to kill or control various unwanted animal and plant species that reduce crop yields. The vast majority of pesticides used in the

8

United States are used by farmers to protect their crops. They are referred to as crop protection products (CPPs).

25. Weeds compete with food crops for water, soil nutrients, and sunlight; pests such as insects or roundworms (known by the scientific name "nematodes") eat crop plants; various species of fungus can cause harmful infections. Any of those infestations can kill or reduce the growth of crop plants and reduce the resulting crop yields.

26. CPPs target those unwanted species in order to protect food crops. CPPs come in various types: (1) herbicides that target unwanted plants, (2) insecticides that target insect pests, (3) nematicides that target roundworm pests, and (4) fungicides that target fungal diseases on plants.

27. CPPs involve one or more active ingredients, which are the chemical(s) that actually kill or harm the targeted weed or pest, and then various inactive ingredients such as water, surfactants (a chemical that helps a liquid spread more easily to increase its effectiveness), or adjuvants (which can slow the drying of a liquid or improve its absorption into the crop leaves).

28. Active ingredients differ from one another in various ways, including: (1) the type of pest or pests that they target, (2) their effectiveness in eliminating or controlling that pest, (3) the type of crops for which they are used, (4) the stage of the growing cycle in which they are used, and (5) how well they function under different climactic and weather conditions.

29.     The way in which a specific active ingredient kills or controls an unwanted weed or pest is known as a "mode of action." Different active ingredients will have different modes of action in terms of the chemical and biological reactions they use to target particular pests. For this reason, a generic version of a brand-name CPP that has the same active ingredients is normally a suitable substitute for that brand-name CPP, while a CPP with different active ingredients would not be.

30.     Companies who manufacture CPPs can either manufacture the active ingredients internally, or can they buy the active ingredients from chemical suppliers.

31.     The companies who engage in their own research and development of active ingredients for CPPs are known as basic manufacturers. Basic manufacturers seek patent protection for the active ingredients that they develop.

32.     Defendants Corteva and Syngenta are basic manufacturers, and they are among the largest CPP manufacturers in the United States.

33.     Generic manufacturers of CPPs typically do not engage in their own research and development of active ingredients. They primarily sell CPPs using active ingredients developed by basic manufacturers for which the patent and regulatory protections have expired. There are more than twelve generic manufacturers selling CPPs in the United States.

34.     CPP manufacturers sell around 90 percent of their total combined output to CPP wholesalers, who either sell them in turn to retailers in farming communities around

the country, or in some cases operate their own retail outlets. The seven largest wholesalers are responsible for about 80% of the total sales of CPPs in the United States.

35.     Wholesalers are by far the best way for a CPP manufacturer to reach the target market of farmers. A CPP manufacturer only has to sell through a few large wholesalers to access a large percentage of all retail outlets serving the vast majority of American farmers. The wholesalers either own their own retail stores or have longstanding relationships with retailers that facilitate their sales of CPPs, and they have a massive infrastructure to support their distribution and sales of CPPs, including logistics, storage facilities, financing, and promotions. CPP manufacturers would encounter huge difficulties and costs trying to develop those capabilities on their own, and it would be far less efficient for them to try to sell directly to retailers or farmers.

**B.      Government Regulation of Crop Protection Products**

36.     The federal government uses regulation and the patent system to encourage CPP manufacture in two distinct ways: (1) seeking to reward companies that create new CPPs by giving them a period of patent and regulatory exclusivity, and (2) once those periods of patent and regulatory exclusivity expire, encouraging generic manufacturers to make much cheaper versions of those CPPs. This allows for a period of large profits for newly created CPPs that encourages continued innovation, but also makes CPPs much more affordable once those periods expire.

11

37.     Patent protection for a basic manufacturer developing a new CPP active ingredient lasts from the date of issuance of the patent until twenty years after the date of the patent application.

38.     The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) is a federal regulatory scheme that also seeks to reward innovation while guaranteeing the safety of CPPs. In order to sell or distribute a CPP in the United States, a manufacturer must conduct research studies about the CPP's toxicity and environmental impact, and then submit that information to the Environmental Protection Agency (EPA), and the EPA reviews that information prior to approving that CPP.

39.     When the EPA approves a new active ingredient for a CPP, the basic manufacturer that applied for approval of that active ingredient has a ten-year period under which other companies are not allowed to rely on the studies and data that it submitted. The effect of this is that the basic manufacturer that obtains the approval has a ten-year exclusive period that can and often does last after the expiration of the patent.

40.     After both the patent protection and FIFRA ten-year period on an active ingredient have expired, a generic manufacturer can get approvals to enter the market by using the same data that the basic manufacturer originally submitted. This is a much faster and easier and cheaper process than a company having to conduct its own research studies.

### C. Generic Entry and Life Cycle Management

41. Once the patent and regulatory exclusivity for a basic manufacturer's branded CPP expire, market entry of generic versions of that CPP is normally associated with active competition between many manufacturers that results in far lower prices. This vastly reduces the profit that the basic manufacturer can make from that CPP after that expiration date.

42. Brand manufacturers engage in corporate strategy planning called "life cycle management" for a branded CPP. This can be done in a perfectly legal and pro-competitive manner, such as determining how a CPP's pricing should change, and how much in promotional expenses should be devoted to that CPP, at different points in its exclusivity period. However, it can also involve anticompetitive methods designed to prevent or delay generic entry or prevent generic entrants from being able to access the market effectively.

### D. Defendants' Anticompetitive 'Loyalty' Programs

43. Corteva and Syngenta each use "loyalty programs" for their wholesalers that are designed to prevent generic competitors from being able to access much of the market for CPPs.

44. Defendants' loyalty programs were established with the intention of maintaining monopoly or near-monopoly exclusivity for their CPPs even after the patent and regulatory protection on those CPPs expired. Defendants achieved their goal of maintaining monopoly power in the markets for CPPS containing the active ingredients

13

rimsulfuron, oxamyl, acetochlor, azoxystrobin, mesotrione, melolachlor, and s-melolachlor (the "Relevant AIs"). CPPs manufactured by Corteva or Syngenta, that contain one or more of the Relevant AIs, and that are the subject of the loyalty programs are referred to herein as the "Relevant CPPs."

45.     Under the loyalty programs, Defendants make large payments to wholesalers and retailers that agree to strictly limit their purchases of certain generic CPPs, namely, those that would compete with CPPs for which Defendants have lost patent and regulatory protection. These large "bonus" payments were a conduit for Defendants to share monopoly profits with the wholesalers and retailers in order to secure their cooperation with the scheme described herein.

46.     The loyalty programs have in fact achieved those goals. Generic competition for the Relevant CPPs has been greatly inhibited due to Defendants using loyalty programs to get wholesalers and retailers to exclude or minimize the distribution and sale of generic versions of the Relevant CPPs.

47.     Further, those small quantities of generic versions of the Relevant CPPs that are still able to be sold are significantly more expensive, due to the fact that output in those markets is significantly restricted and prices are artificially higher as a result, allowing generic manufacturers to price their products significantly higher than they would in the event of open competition.

14

### 1. Corteva's Loyalty Program

48.  Corteva's loyalty program is intended to, and does in fact, exclude or minimize generic competition for Corteva CPPs that have lost patent and regulatory exclusivity.

49.  Corteva's loyalty program provides payments to wholesalers that make a very high percentage of their purchases of certain CPPs from Corteva, thereby causing wholesalers to limit their purchases of generic competitors of those CPPs to a very low percentage share of their overall purchases of those CPPs.

50.  As a result of excluding or minimizing generic competition, Corteva is able to continue to charge high prices for its CPPs even after they have lost patent and regulatory exclusivity, and still maintain high market share, allowing it to gain supracompetitive profits that it would not receive if there was open competition with generic competitors across the distribution chain.

51.  Corteva uses these incentive payments to wholesalers (including wholesalers who operate retail outlets) to coerce wholesalers into this scheme, sharing part of its supracompetitive profits with them in exchange for their role in excluding generic competition and allowing those supracompetitive profits to continue. This arrangement between Corteva and the wholesalers (including wholesalers who operate retail outlets) constitutes an unlawful contract, combination, or conspiracy under Section 1 of the Sherman Act.

## 2. Syngenta's Key AI Loyalty Program

52.     Syngenta's loyalty program is called the "Key AI" program.

53.     Syngenta allows both wholesalers and retailers to participate in the Key AI program.

54.     The Key AI program is intended to and does in fact exclude or minimize generic competition for Syngenta CPPs that have lost patent and regulatory exclusivity.

55.     The Key AI program provides payments to wholesalers that make a very high percentage of their purchases of certain CPPs from Syngenta, thereby causing the wholesalers to limit their purchases of generic competitors of those CPPs to a very low percentage share of their overall purchases of those CPPs.

56.     As a result of excluding or minimizing generic competition, Syngenta is able to continue to charge high prices for its CPPs even after they have lost patent and regulatory exclusivity, and still maintain high market share, allowing it to gain supracompetitive profits that it would not receive if there was open competition with generic competitors across the distribution chain.

57.     Syngenta uses these incentive payments to wholesalers and retailers to encourage the cooperation of wholesalers and retailers in this scheme, sharing part of its supracompetitive profits with them in exchange for their role in excluding generic competition and allowing those supracompetitive profits to continue. This arrangement between Syngenta and wholesalers and retailers constitutes an unlawful contract, combination, or conspiracy under Section 1 of the Sherman Act.

16

### E.    Market Effects of the Loyalty Programs

58.    Corteva and Syngenta have entered into loyalty agreements with all major wholesalers of CPPs in the United States, including wholesalers that are also major national retailers of CPPs. (Wholesalers and retailers who have entered into loyalty agreements with Corteva or Syngenta are referred to herein as "Wholesaler and Retailer Co-Conspirators.")

59.    Since the major wholesalers have such a large market share, this gives Corteva and Syngenta's loyalty agreements a substantial market-wide effect and serves to greatly restrict competition for the Relevant CPPs, resulting in higher prices for farmers and increased profits for Corteva and Syngenta.

60.    All the major wholesalers know that all their major competitors participate in these loyalty programs and are thereby assured that no one wholesaler will want to leave the loyalty program agreements and sell lower priced generics instead, because this would undermine the entire scheme and jeopardize the large profits that the wholesalers obtain from the combined loyalty programs.

61.    Since the loyalty program requirements are typically that the retailer must purchase a very high share of Syngenta CPPs out of its total purchases of CPPs containing a particular Relevant AI or risk losing a very large incentive payment, retailers often avoid any risk of missing the required share by not dealing with generic competitors at all, or by minimizing their purchases and interactions with them and their promotion of generic products.

17

62.     Further, those small quantities of generic versions of the Relevant CPPs that are still able to be sold are significantly more expensive, due to the fact that output in those markets is significantly restricted and prices are artificially higher as a result, allowing generic manufacturers to price their products significantly higher than they would in the event of open competition.

**F.     CPPs Subject to Corteva's Loyalty Program**

63.     Corteva's loyalty program includes CPPs using three specific active ingredients for which patent and regulatory exclusivities have expired: rimsulfuron, oxamyl, and acetochlor.

64.     Rimsulfuron is an herbicide that is used to hinder weed growth in various types of crop fields.

65.     After Corteva's patent and regulatory exclusivity for rimsulfuron expired, generic manufacturers introduced generic versions of CPPs containing rimsulfuron that were priced significantly lower than Corteva's branded versions.

66.     However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing rimsulfuron, despite their products having the same active ingredient(s) and being much cheaper.

67.     In order to meet the loyalty program's share requirement and continue to receive large incentive payments, Wholesaler and Retailer Co-Conspirators strictly limit purchases of CPPs containing generic rimsulfuron or do not purchase generics at all, they

18

do not promote generic CPPs containing rimsulfuron, and they encourage their customers to buy Corteva's CPPs containing rimsulfuron rather than generic competitors.

68.     This has effectively minimized generic competition for Corteva in the market for CPPs containing rimsulfuron, which has resulted in much higher profits for Corteva from CPPs containing rimsulfuron than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

69.     Oxamyl is an insecticide and nematicide used to control pests in various crop fields, particularly cotton fields and fruit and vegetable fields.

70.     After Corteva's patent and regulatory exclusivity for oxamyl expired, generic manufacturers introduced generic versions of CPPs containing oxamyl that were priced significantly lower than Corteva's branded versions.

71.     However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing oxamyl, despite their products having the same active ingredient and being much cheaper.

72.     In order to meet the loyalty program's share requirement and continue to receive large incentive payments, Wholesaler and Retailer Co-Conspirators strictly limit purchases of generic CPPs containing oxamyl or do not purchase generics at all, they do not promote generic CPPs containing oxamyl, and they encourage their customers to buy Corteva's CPPs containing oxamyl rather than generic competitors.

19

73.     This has effectively minimized generic competition for Corteva in the market for CPPs containing oxamyl, which has resulted in much higher profits for Corteva from CPPs containing oxamyl than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

74.     Acetochlor is an herbicide that inhibits weed growth particularly in corn fields, but also in fields of crops such as soybeans and sugar beets.

75.     Corteva and Bayer are partners in a joint venture that owns the U.S. registration for acetochlor, Bayer does the actual manufacturing of acetochlor, and Corteva sells CPPs containing acetochlor that are subject to loyalty program agreements as described herein.

76.     After Corteva and Bayer's patent and regulatory exclusivity for acetochlor expired, generic manufacturers introduced generic versions of CPPs containing acetochlor that were priced significantly lower than Corteva's branded versions.

77.     However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing acetochlor, despite their products having the same active ingredient(s) and being much cheaper.

78.     In order to meet the loyalty program's share requirement and continue to receive large incentive payments, Wholesaler and Retailer Co-Conspirators strictly limit purchases of generic CPPs containing acetochlor or do not purchase generics at all, they

do not promote generic CPPs containing acetochlor, and they encourage their customers to buy Corteva CPPs containing acetochlor rather than generic competitors.

79.     This has effectively minimized generic competition for Corteva in the market for CPPs containing acetochlor and has also caused generic manufacturers to postpone or cancel introducing CPPs containing acetochlor to the United States market, which has resulted in much higher profits for Corteva from CPPs containing acetochlor than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

80.     Wholesaler and Retailer Co-Conspirators have received loyalty payments from Corteva as a result of their cooperation with Corteva's restraint of trade and have thereby profited from their willing participation in Corteva's scheme.

**G.     CPPs Subject to Syngenta's Key AI Loyalty Program**

81.     Syngenta's Key AI loyalty program includes CPPs containing three active ingredients for which patent and regulatory exclusivities have expired: azoxystrobin, mesotrione, and metolachlor (and s-metolachlor, as will be explained below).

82.     Azoxystrobin is a fungicide that is used to kill and control fungal diseases on crops.

83.     After Syngenta's patent and regulatory exclusivity for azoxystrobin expired, generic manufacturers introduced generic versions of CPPs containing azoxystrobin that were priced significantly lower than Syngenta's branded versions.

21

84.    However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing azoxystrobin, despite their products having the same active ingredient(s) and being much cheaper.

85.    In order to meet the loyalty program's share requirement and continue to receive large incentive payments, Wholesaler and Retailer Co-Conspirators strictly limit purchases of generic CPPs containing azoxystrobin or do not purchase generics at all, they do not promote generic CPPs containing azoxystrobin, and they encourage their customers to buy Syngenta's CPPs containing azoxystrobin rather than generic competitors.

86.    This has effectively minimized generic competition for Syngenta in the market for CPPs containing azoxystrobin and has also caused at least one generic manufacturer to not introduce an azoxystrobin product to the United States market, which has resulted in much higher profits for Syngenta from CPPs containing azoxystrobin than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

87.    Mesotrione is an herbicide that controls common weeds in corn fields.

88.    After Syngenta's patent and regulatory exclusivity for mesotrione expired, generic manufacturers introduced generic versions of CPPs containing mesotrione that were priced significantly lower than Syngenta's branded versions.

89. However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing mesotrione, despite their products having the same active ingredient(s) and being much cheaper.

90. In order to meet the loyalty program's share requirement and continue to receive large incentive payments, Wholesaler and Retailer Co-Conspirators strictly limit purchases of generic CPPs containing mesotrione or do not purchase generics at all, they do not promote generic CPPs containing mesotrione, and they encourage their customers to buy Syngenta's CPPs containing mesotrione rather than generic competitors.

91. This has effectively minimized generic competition for Syngenta in the market for CPPs containing mesotrione and has also caused at least two generic manufacturers to postpone or cancel introducing a mesotrione product to the United States market, which has resulted in much higher profits for Syngenta from CPPs containing mesotrione than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

92. Metolachlor is an herbicide that controls common weeds in various crop fields, including corn, soybeans, and sorghum.

93. Products containing "metolachlor" contains a 50-50 mixture of s-metolachlor and r-metolachlor, which have identical molecular makeups but are arranged differently (similar to a left and right glove). Syngenta's CPPs contain predominantly s-metolachlor (88% s-metolachlor and 12% r-metolachlor). CPPs using predominantly s-

23

metalachlor are far more effective at killing weeds than CPPs that use the mixed version of metolachlor.

94.     After Syngenta's patent and regulatory exclusivity for metolachlor expired, generic manufacturers introduced generic versions of CPPs containing metolachlor that were priced significantly lower than Syngenta's branded versions.

95.     After Syngenta's patent and regulatory exclusivity for s-metolachlor expired, generic manufacturers introduced generic versions of CPPs containing s-metolachlor that were priced significantly lower than Syngenta's branded versions.

96.     However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the markets for CPPs containing metolachlor and s-metolachlor, despite their products having the same active ingredient(s) and being much cheaper.

97.     In order to meet the loyalty program's share requirement and continue to receive large incentive payments, Wholesaler and Retailer Co-Conspirators strictly limited purchases of generic CPPs containing metolachlor and s-metolachlor or do not purchase generics at all, they do not promote generic CPPs containing metolachlor and s-metolachlor, and they encourage their customers to buy Syngenta's CPPs containing metolachlor and s-metolachlor rather than generic competitors.

98.     This has effectively minimized generic competition for Syngenta in the market for CPPs containing metolachlor and s-metolachlor, and it has also caused generic manufacturers to postpone or cancel introducing metolachlor products to the United

24

States market, which has resulted in much higher profits for Syngenta from CPPs containing metolachlor and s-metolachlor than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

99.  Wholesaler and Retailer Co-Conspirators have received loyalty payments from Syngenta as a result of their cooperation with Syngenta's restraint of trade and have thereby profited from their willing participation in Syngenta's scheme.

## V.  RELEVANT MARKETS

100.  At all relevant times, Corteva had market power and monopoly power in the markets for CPPs containing rimuslfuron and oxamyl, and market power in the market for CPPs containing acetochlor. Corteva had the power to maintain the price of those CPPs at supracompetitive levels profitably without losing substantial sales to other products used for the same purposes as each of those CPPs.

101.  At all relevant times, Syngenta had market power and monopoly power in the markets for CPPs containing azoxystrobin, mesotrione, metolachlor, and s-metolachlor. Syngenta had the power to maintain the price of those CPPs at supracompetitive levels profitably without losing substantial sales to other products used for the same purposes as each of those CPPs.

102.  To the extent Plaintiff's claims require the definition of a relevant market, the relevant product markets are the markets for EPA-registered CPPs for sale in the United States that contain each of the specific Relevant AIs. For example, for the

25

Relevant AI azoxystrobin, the relevant product market is the market for EPA-registered CPPs for sale in the United States that contain azoxystrobin, and it would include Syngenta's CPPs containing azoxystrobin and any generic versions of those CPPs.

103. To the extent Plaintiff's claims require the definition of a relevant market, the relevant geographic market is the United States. The EPA has to approve CPPs for sale and use in the United States, and farmers in the United States are not allowed to legally use CPPs from other countries that have not been approved for sale and use in the United States. Therefore, the price of CPPs in other countries does not affect the market for CPPs in the United States.

104. Defendants have a very high market share in the markets for CPPs containing each of the Relevant AIs, despite the fact that those CPPs do not currently possess patent and regulatory exclusivities. There are significant barriers to entry for generic manufacturers being able to enter the market for any CPP, in addition to patent and regulatory barriers, including the need for EPA registration, access to supplies of active and inactive ingredients, manufacturing facilities and know-how, and the ability to distribute products effectively. Defendants' actions have also created further effective barriers to entry for generic competitors for the Relevant CPPs that prevent them from accessing the traditional distribution channel and being able to compete effectively in those markets.

105. For each of the Relevant CPPs, its only reasonable substitute is a generic version of that Relevant CPP. Other CPPs with different active ingredients will affect

26

different types of weeds or pests, be suitable for different climate and weather conditions or types of crop fields, and/or have different modes of action in terms of the chemical and biological reactions they use to target particular weeds or pests and therefore would obtain different results than the particular Relevant CPP in question.

106. Azoxystrobin is differentiated from other CPPs used for similar purposes in that it can be used with all major row crops, making application easier, and it also is claimed to have growth-promoting effects on crops.

107. Mesotrione is differentiated from other CPPs used for similar purposes due to its greater efficacy and crop safety and lower use rate than other CPPs.

108. Metolachlor is differentiated from other CPPs used for similar purposes due to its greater solubility in water (which improves its performance in drier conditions), its better performance in warmer conditions, and its ability to be used with a wider variety of crop fields.

109. S-metolachlor shares the advantages of metolachlor but has even greater efficacy in killing weeds.

110. Rimsulfuron is differentiated from other CPPs used for similar purposes due to the fact that it affects more different types of weeds, it can be used with a wider variety of crop fields, and it can be used preemptively to prevent weed growth as well to control an existing weed problem.

111.    Oxamyl is differentiated from other CPPs used for similar purposes in that it has less risks to crops or soil health, and it can be applied right onto crops instead of applied at root level or in the soil.

112.    Acetochlor is differentiated from other CPPs used for similar purposes due to its superior performance in wetter or cooler conditions, its greater efficacy against particular types of weeds, and its greater efficacy earlier in the growing season.

113.    A small but significant and non-transitory artificial inflation of the price of any of the Relevant CPPs would not cause any significant number of consumers to purchase CPPs with different active ingredients so as to make such price inflation unprofitable. A small but significant and non-transitory artificial inflation of the price of any CPPs with different active ingredients than the Relevant CPPs would not cause any significant number of consumers to purchase the Relevant CPPs instead so as to make the artificial price inflation unprofitable.

## VI.  CLASS ACTION ALLEGATIONS

114.    Plaintiff brings this action on behalf of itself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23 as representative of a Class defined as follows:

> All persons or entities in the United States that purchased CPPs containing rimsulfuron, oxamyl, acetochlor, azoxystrobin, mesotrione, metolachlor, or s-metolachlor, directly from any Wholesaler or Retailer Co-Conspirator during the period beginning at least as early as January 1, 2017 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period"). Excluded from the Class are (a) Defendants and their subsidiaries, affiliate entities, and employees, and (b) all federal or state government entities or agencies.

28

115.    The members of the Class are so numerous that joinder is impracticable. At least hundreds of thousands of farms and farmers in the United States purchased the Relevant CPPs and generic competitors to the Relevant CPPs during the Class Period.

116.    There are numerous questions of law and fact that are common to the Class and that predominate over any issues affecting individual members of the Class, including, inter alia:

a.    Whether Defendants conspired with wholesalers and retailers to restrain generic competition in exchange for a share of Corteva and Syngenta's supracompetitive profits through loyalty payments;

b.    Whether Defendants' loyalty programs were intended to exclude or minimize generic competition for the Relevant CPPs;

c.    Whether Defendants' loyalty programs did in fact exclude or minimize generic competition for Relevant CPPs;

d.    Whether Defendants' actions caused the retail price of the Relevant CPPs to increase above competitive levels;

e.    Whether Defendants continued to have market power in the markets for Relevant CPPs after their lawfully obtained patent and regulatory exclusivity periods had expired;

f.    Whether Defendants' loyalty programs have a legitimate pro-competitive justification;

g.      Whether the conduct alleged herein artificially maintained, preserved, or enhanced Defendants' market power in the markets for the Relevant CPPs;

h.      Whether Defendants willfully acquired and maintained monopoly power in the markets for the Relevant CPPs, after its lawfully obtained patent and regulatory exclusivities on those CPPs had expired, by means of its loyalty programs; and

i.      Whether generic versions of the Relevant CPPs were more expensive as a result of Defendants' anticompetitive actions as described herein.

117.    Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for CPPs.

118.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

119.    Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries, including the agricultural industry, and in courts throughout the nation.

120.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

121.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

122.     Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VII.  ANTITURST INJURY

123.     Defendants Corteva and Syngenta's loyalty programs were intended to, and did in fact, exclude or minimize generic competition for the Relevant CPPs.

124.     Defendants' loyalty programs excluded or minimized generic competition for each of the Relevant CPPs and did so with the cooperation of wholesaler and retailer

31

co-conspirators, causing Plaintiff and members of the proposed Class to pay artificially

inflated prices for each the Relevant CPPs and for their generic competitors, as compared

to the prices they would have paid absent those loyalty programs and with open

competition from generic competitors across the distribution chain. This injury is

ongoing.

125.    Plaintiff and other members of the proposed Class have sustained

substantial losses and damage to their business and property in the form of overcharges

on their purchases of Relevant CPPs and their generic competitors. The full amount,

forms, and components of such damages will be determined after discovery and upon

proof at trial.

126.    The prices of the Relevant CPPs and their generic competitors have been,

and will continue to be, artificially inflated as a result of the Defendants' anticompetitive

conduct. The inflated prices that Plaintiff and other members of the proposed Class have

paid for the Relevant CPPs and their generic competitors, and will continue to pay until

Defendants' conduct ceases, are the foreseeable result of Defendants' anticompetitive

conduct.

## VIII.   CONTINUING VIOLATIONS AND FRAUDULENT CONCEALMENT

127.    A cause of action accrued for Plaintiff each time Plaintiff bought one of the

Relevant CPPs or its generic competitors at a supracompetitive price caused by

Defendants' loyalty program scheme. And each sale of a Relevant CPP or its generic

competitor at a supracompetitive price caused by Defendants' loyalty program scheme

32

constituted another overt act in furtherance of their anticompetitive scheme. Accordingly, even though certain of the loyalty programs described herein were entered into more than four years prior to the filing of this lawsuit, Plaintiff is entitled to recover all damages on all purchases by Plaintiff of Corteva or Syngenta's Relevant CPPs or their generic competitors at supracompetitive prices within four years of the filing of this lawsuit.

128.    Additionally, due to Defendants' concealment of their unlawful conduct, Plaintiff and members of the Class are entitled to recover damages reaching back even beyond four years of the filing of this complaint. The fact that Corteva and Syngenta entered into loyalty programs with certain wholesalers and retailers was not discoverable until after FTC and certain state attorneys general filed their complaint against Corteva and Syngenta in September 2022. Plaintiff and members of the Class had no knowledge of the Defendants' unlawful, self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years before the filing of this complaint.

129.    This is true because the nature of the Defendants' scheme was self-concealing and because the Defendants employed deceptive tactics and techniques of secrecy to avoid detection of, and to conceal, their contracts, combinations, conspiracy and scheme.

130.    The Defendants wrongfully and affirmatively concealed the existence of their ongoing combination and conspiracy from Plaintiff and members of the Class by, among other things, entering into contracts with wholesalers and retailers that were not

publicly disclosed, and failing to disclose the means of operation of these loyalty programs in legally mandated public disclosure documents, such as SEC filings.

131.    Because the scheme and conspiracy were both self-concealing and affirmatively concealed by the Defendants, Plaintiff and members of the Class had no knowledge of the scheme and conspiracy more than four years before the filing of this complaint; nor did they have the facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

132.    Plaintiff and members of the Class also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred. Reasonable diligence on the part of Plaintiff and members of the Class would not have uncovered those facts more than four years before the filing of this complaint.

133.    As a result of the Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and Class members' claims have been tolled.

## IX.  CLAIMS FOR RELIEF

### COUNT 1

**Conspiracy to Restrain Trade in
Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**

134.    Plaintiff hereby restates and incorporates the preceding paragraphs as if fully set forth herein.

135.    Defendants violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 by entering into unlawful loyalty agreements with wholesalers and retailers that were

34

intended to, and did in fact, restrain generic competition in the markets for the Relevant CPPs.

136. Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 injured Plaintiff in its business or property. The injuries of Plaintiff and members of the Class consist of having paid higher prices for the Relevant CPPs and generic versions of the Relevant CPPs than they would have paid in the absence of those violations. Such injuries are of the type that the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct described herein unlawful.

137. At all relevant times, Defendants Corteva and Syngenta possessed market power in the relevant market for each of the Relevant CPPs. But for Defendants' wrongful conduct, as alleged herein, open competition from generic manufacturers of each of those Relevant CPPs would have greatly reduced prices at all points along the distribution chain, including the retail prices paid by Plaintiff and members of the Class.

138. Defendants entered into loyalty payment agreements with Wholesaler and Retailer Co-Conspirators under which they made large payments in exchange for those wholesalers and retailers agreeing to minimize their purchases and sales of generic competitors to Relevant CPPs. Defendants entered into these agreements in order to, and did in fact, unreasonably restrain trade in the markets for each of the Relevant CPPs, the purpose and effect of which was to: (a) prevent generic competitors for the Relevant CPPs from being able to access large parts of the market, and (b) allow their own branded Relevant CPPs to be sold at significantly higher prices and still maintain most of the

35

market, thereby artificially increasing the prices that Plaintiff and other members of the Class would pay for each of the Relevant CPPs. Corteva and Syngenta used the loyalty programs to divert a portion of their supracompetitive profits from this restraint of trade and resulting higher prices and sales to the Wholesaler and Retailer Co-Conspirators in order to obtain their cooperation with the scheme.

139.    There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' conduct that outweighs its harmful effect on purchasers and competition. Defendants' conduct can only be explained by anticompetitive motives and a desire to foreclose competition in the markets for the Relevant CPPs. Even if there were some conceivable and cognizable justification, Defendants' loyalty program agreements were not necessary to achieve such a purpose. Any supposed procompetitive benefits are false and pretextual and/or could have been achieved in a less restrictive manner.

140.    Further, those small quantities of generic versions of the Relevant CPPs that are still able to be sold are significantly more expensive, due to the fact that output in those markets is significantly restricted and prices are artificially higher as a result, allowing generic manufacturers to price their products significantly higher than they would in the event of open competition.

141.    As a direct and proximate result of Defendants' anticompetitive conduct involving the loyalty program agreements described herein, Plaintiff and members of the Class were harmed.

142. As a direct, material, and proximate result of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Plaintiff and members of the Class have suffered injury to their business or property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15(a), throughout the Class Period.

143. Plaintiff and members of the Class are entitled to treble damages for Defendants' violations of Section 1 of the Sherman Antitrust Act, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

144. Defendants' unlawful conduct is ongoing and will continue unless restrained. Until the activities complained of are enjoined, Plaintiff and members of the Class will suffer immediate and irreparable injury. Plaintiff and members of the Class are also entitled to an injunction against Defendants preventing and restraining further violations, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT 2

**Monopolization in Violation of Section 2 of the Sherman Act**
**(15 U.S.C § 2)**
**(Against Corteva)**

145. Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

146. The relevant product markets are the market for EPA-registered CPPs for sale in the United States that contain rimsulfuron, and the market for EPA-registered CPPs for sale in the United States that contain oxamyl. The relevant geographic market is the United States.

147. As a result of the scheme alleged herein, Corteva possesses monopoly power in the market for EPP-registered CPPs for sale in the United States that contain rimsulfuron, and the market for EPP-registered CPPs for sale in the United States that contain oxamyl.

148. Corteva willfully maintained its monopoly power in those markets even after its patent and regulatory exclusivities expired by means of the loyalty program scheme described herein, under which it made large payments to the Wholesaler Defendants and the Retailer Defendants in exchange for those wholesalers and retailers agreeing to minimize their purchases and sales of generic competitors to Corteva's CPPs containing rimsulfuron and oxamyl.

149. Corteva's actions were carried out willfully and with the specific intent to maintain its monopoly power in those markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

150. The direct, foreseeable, and proximate result of Corteva's anticompetitive conduct was to increase prices and harm competition in those markets.

151. There is no legitimate pro-competitive justification for Corteva's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

152. As a direct, material, and proximate result of Corteva's violation of Section 2 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of Section 4 of the Clayton Act throughout the Class Period.

Case 1:23-cv-00147-TDS-JEP    Document 1    Filed 02/14/23    Page 38 of 46

153.    Plaintiff and the Class seek treble damages for Corteva's violations of Section 2 of the Sherman Act under Section 4 of the Clayton Act.

154.    Plaintiff and the Class also seek an injunction against Corteva, preventing and restraining the violations alleged above, under Section 16 of the Clayton Act.

## COUNT 3

### Monopolization in Violation of Section 2 of the Sherman Act
### (15 U.S.C § 2)
### (Against Syngenta)

155.    Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

156.    The relevant product markets are the market for EPA-registered CPPs for sale in the United States that contain azoxystrobin, the market for EPA-registered CPPs for sale in the United States that contain mesotrione, the market for EPA-registered CPPs for sale in the United States that contain metolachlor, and the market for EPA-registered CPPs for sale in the United States that contain s-metolachlor. The relevant geographic market is the United States.

157.    As a result of the scheme alleged herein, Syngenta possesses monopoly power in each of those markets.

158.    Syngenta willfully maintained its monopoly power in those markets even after its patent and regulatory exclusivities expired by means of the loyalty program scheme described herein, under which it made large payments to the Wholesaler Defendants and the Retailer Defendants in exchange for those wholesalers and retailers

39

agreeing to minimize their purchases and sales of generic competitors to Syngenta's CPPs containing azoxystrobin, mesotrione, metolachlor, and s-metolachlor.

159.     Syngenta's actions were carried out willfully and with the specific intent to maintain its monopoly power in those markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

160.     The direct, foreseeable, and proximate result of Syngenta's anticompetitive conduct was to increase prices and harm competition in those markets.

161.     There is no legitimate pro-competitive justification for Syngenta's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

162.     As a direct, material, and proximate result of Syngenta's violation of Section 2 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of Section 4 of the Clayton Act throughout the Class Period.

163.     Plaintiff and the Class seek treble damages for Syngenta's violations of Section 2 of the Sherman Act under Section 4 of the Clayton Act.

164.     Plaintiff and the Class also seek an injunction against Syngenta, preventing and restraining the violations alleged above, under Section 16 of the Clayton Act.

## **COUNT 4**

### **STATE ANTITRUST LAWS**

165.     Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

40

166.     Defendants have violated, and Plaintiff and members of the Class are entitled to relief under, the antitrust laws of the States of Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

   a.   Ariz. Rev. Stat. Ann. §§ 44-1403, *et seq.*;

   b.   Cal. Bus. Code §§ 16700, *et seq.*;

   c.   Conn. Gen. Stat. §§ 35-27, *et seq.*;

   d.   D.C. Code §§ 28-4503, *et seq.*;

   e.   Haw. Rev. Stat. §§ 480-2, 480-9, *et seq.*;

   f.   740 Ill. Comp. Stat. §§ 10/3, *et seq.*;

   g.   Iowa Code §§ 553.5, *et seq.*;

   h.   Kan. Stat. Ann. §§ 50-112, *et seq.*;

   i.   Me. Rev. Stat. Ann. 10 §§ 1102, *et seq.*;

   j.   MD Code Ann., Com. Law, §§ 11-204, *et seq.*;

   k.   Mich. Comp. Laws Ann. §§ 445.773, *et seq.*;

   l.   Minn. Stat. §§ 325D.52, *et seq.* and Minn. Stat. §§ 8.31, *et seq.*;

   m.   Miss. Code Ann. §§ 75-21-3, *et seq.*;

   n.   Neb. Rev. Stat. §§ 59-802, *et seq.*;

   o.   Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*;

41

p.  N.H. Rev. Stat. Ann. §§ 356:3, *et seq.*;

q.  N.M. Stat. Ann. §§ 57-1-2, *et seq.*;

r.  N.Y. Gen. Bus. Law § 340;

s.  N.C. Gen. Stat. §§ 75-2.1, *et seq.*;

t.  N.D. Cent. Code Ann. §§ 51-08.1-03, *et seq.*;

u.  Or. Rev. Stat. §§ 646.730, *et seq.*;

v.  R.I. Gen. Laws §§ 6-36-5, *et seq.*;

w.  S.D. Codified Laws §§ 37-1-3.2, *et seq.*;

x.  Tenn. Code Ann. §§ 47-25-101, *et seq.*;

y.  Utah Code Ann. §§ 76-10-3104, *et seq.*;

z.  Vt. Stat. Ann. 9, §§ 2453, *et seq.*;

aa. W.Va. Code §§ 47-18-4, *et seq.*;

bb. Wis. Stat. §§ 133.03, *et seq.*

## COUNT 5

### STATE UNFAIR TRADE PRACTICES LAWS

167.    Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

168.    By reason of the foregoing, Defendants have violated, and Plaintiff and members of the Class are entitled to relief under, the Unfair Trade Practices and Consumer Protection Laws of the States of Arkansas, California, Connecticut, Florida,

42

Massachusetts, Missouri, Montana, New Mexico, New York, North Carolina, Rhode Island, South Carolina, and Vermont, as well as the District of Columbia, as follows:

    a.  Ark. Code Ann.§§ 4-88-101, *et seq.*;

    b.  Cal. Bus. & Prof Code §§ 17200, *et seq.*;

    c.  Conn. Gen. Stat. §42-110a, *et seq.*;

    d.  D.C. Code §§ 28-3901, *et seq.*;

    e.  Fla. Stat. §§ 501.201, *et seq.*;

    f.  Mass. Gen. Laws ch. 93A, *et seq.*;

    g.  Mo. Rev. Stat. §§ 407.010, *et seq.*;

    h.  Mont. Code Ann., §30-14-103, et seq., and §30-14-201, *et seq.*;

    i.  N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

    j.  N.Y. Gen. Bus. Law §§ 349, *et seq.*;

    k.  N.C. Gen. Stat. §§ 75-1, *et seq.*;

    l.  R.I. Gen. Laws §§ 6-13.1-1, *et seq.*;

    m.  S.C. Code Ann. §39-5-10, *et seq.*; and

    n.  VT. Stat. Ann., tit. 9, §2451, *et seq*.

## X.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully request that the Court:

    A.  Determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class

Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. Adjudge and decree Defendants' agreements, contracts, combinations, or conspiracies, and acts done in furtherance thereof by Defendants and their co-conspirators, to be violations of Section 1 of the Sherman Act (15 U.S.C. § 1);

C. Adjudge and decree Corteva's conduct to be unlawful monopolization of the markets for CPPs containing rimuslfuron and oxamyl in violation of Section 2 of the Sherman Act (15 U.S.C § 2);

D. Adjudge and decree Syngenta's conduct to be unlawful monopolization the markets for CPPs containing azoxystrobin, mesotrione, metolachlor, and s-metolachlor, in violation of Section 2 of the Sherman Act (15 U.S.C § 2);

E. Permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F. Enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by

Plaintiffs and the Class as allowed by law, together with costs of the action, including

reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from

and after the date of service of this Complaint to the extent provided by law; and

G.  Award Plaintiffs and members of the Class such other and further relief as

the case may require and the Court may deem just and proper under the circumstances.

## XI.   JURY TRIAL DEMANDED

169.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal

Rules of Civil Procedure, of all issues so triable.

Dated: February 14, 2023                          Respectfully submitted,

**/s/ Allison Mullins**
Allison Mullins
N.C. State Bar No. 23430
L. Cooper Harrell
N.C. State Bar No. 27875
TURNING POINT LITIGATION
MULLINS DUNCAN HARRELL &
   RUSSELL PLLC
300 North Greene Street, Suite 2000
Greensboro, NC 27401
Telephone: 336-645-3320
Facsimile: 336-645-3330
amullins@turningpointlit.com
charrell@turningpointlit.com

45

OF COUNSEL:

Gregory S. Asciolla
Karin E. Garvey
Jonathan S. Crevier
Johnny M. Shaw
**DICELLO LEVITT, LLC**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
jcrevier@dicellolevitt.com
jshaw@dicellolevitt.com

Charles F. Barrett
**NEAL & HARWELL, PLC**
1201 Demonbreun Street
Suite 1000
Nashville, Tennessee 37203
Telephone: (615) 244-1713
cbarrett@nealharwell.com

Jonathan P. Barrett
**BARRETT LAW, PLLC**
121 Colony Crossing, Suite D
Madison, MS 39110
Telephone: 601-790-1505
jpb@barrettlawms.com

*Counsel for Plaintiff and the Proposed Class*